**DALLAS COWBOYS CHEERLEADERS, INC., Plaintiff,**

v.

**PUSSYCAT CINEMA, LTD., Michael Zaffarano, et al., Defendants.**

**No. 79 Civ. 514.**

United States District Court,
S. D. New York.

March 12, 1979.

368

J. Asa Rountree, Richard I. Janvey, Debevoise, Plimpton, Lyons & Gates, New York City, for plaintiff.

Herbert S. Kassner, Kassner & Detsky, New York City, for defendants.

## OPINION

GRIESA, District Judge.

Plaintiff operates a group known as the Dallas Cowboys Cheerleaders. Defendants Pussycat Cinema, Ltd. and Zaffarano are alleged to be connected with the production and exhibition of a motion picture entitled "Debbie Does Dallas."

The action was brought to enjoin the distributing, showing and advertising of this motion picture on the ground of alleged violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and on other theories.

The action was commenced on January 31, 1979. At that time the only defendant served was Pussycat Cinema, Ltd. A motion for preliminary injunction was made against that defendant. No one appeared in opposition to that motion. Nevertheless a hearing was held, and affidavits, testimony and exhibits were received and considered by the Court, together with a substantial brief on the law submitted by plaintiff. The motion was granted on February 13 in a bench decision. The preliminary injunction was signed that day, prohibiting Pussycat Cinema, Ltd. and all persons acting in concert therewith from distributing, exhibiting or advertising Debbie Does Dallas.

Contempt proceedings were instituted to enforce that injunction, resulting in the arrest of certain persons who were involved in the showing of Debbie Does Dallas at a New York movie theater, the Pussycat Cinema 2. The result was that the showing of the film ceased on February 15. On that day defendant Zaffarano appeared in court through counsel, and admitted that he was personally responsible for the showing of the film at the Pussycat Cinema 2, and that the arrested persons were his employees.

On February 16 defendant Zaffarano applied to vacate the preliminary injunction of February 13 directed against Pussycat Cinema, Ltd., insofar as that injunction affected defendant Zaffarano and his showing of Debbie Does Dallas at the Pussycat Cinema 2. Defendant Zaffarano contended that Pussycat Cinema, Ltd. was a defunct corporation, and was not involved in the ownership of the Pussycat Cinema 2 or the showing of Debbie Does Dallas. That motion was denied.[1]

Also, on February 16, plaintiff made a motion for an additional preliminary injunction against defendant Zaffarano individually, and moved for a temporary restraining order pending the hearing of the motion for an additional preliminary injunction. The temporary restraining order was granted against Zaffarano individually. The hearing on the motion for an additional preliminary injunction against defendant Zaffarano was held February 27.

The following are my findings of fact and conclusions of law with respect to the motion for preliminary injunction against defendant Zaffarano. The motion is granted.

### I.

As already noted, plaintiff operates a group known as the Dallas Cowboys Cheerleaders, consisting of 36 women who perform at professional football games played by the Dallas Cowboys.

---

1. To this day no one has formally appeared in this action for defendant Pussycat Cinema, Ltd.

The Dallas Cowboys Cheerleaders came into being in 1972. They have appeared at about 90 professional football games since that time. At these games they perform choreographed cheerleading and dance routines. Through these games they have become known to millions of persons attending the games and watching them on television. They have become a highly popular entertainment group.

Their popularity is sufficient that plaintiff receives a steady stream of requests for personal appearances by the group or members thereof. In recent times there have been about 150 to 200 personal appearances per year at such functions as sporting goods shows and openings of shopping malls. Apparently thousands of people will stand in long lines to get the autographs of cheerleaders at personal appearances. These appearances are made for a fee, and plaintiff obtains substantial revenues from these appearances. In addition to their appearances on television in connection with the football games, the Dallas Cowboys Cheerleaders make other television appearances, producing substantial revenues for plaintiff.

Plaintiff also licenses the use of the Dallas Cowboys Cheerleaders name and the distinctive uniform used by the cheerleaders for use in connection with certain products such as posters, playing cards, calendars, and T shirts. Plaintiff derives substantial revenues from this licensing.

Plaintiff has exercised substantial effort and care to promote the popularity of the Dallas Cowboys Cheerleaders and to give them a particular public image. The members of the 36-member group are carefully chosen. Thousands have applied for the small number of positions available. Not only must the cheerleaders have physical beauty, but they must also have dancing ability and they must represent various occupations which can be thought to constitute something of the cross-section of the American woman.

The Dallas Cowboys Cheerleaders must meet standards regarding moral character. For instance, no one is accepted who has been photographed for magazines such as Playboy or Hustler.

The Dallas Cowboys Cheerleaders are also known by the somewhat shorter names of Dallas Cheerleaders and Dallas Cowgirls. The uniform in which they appear and perform consists of a blue bolero blouse, white vest decorated with three blue five-pointed stars on each side of the front of the vest and white fringe at the bottom of the vest, tight white shorts with a belt decorated with blue stars, and white boots.

The evidence shows that the names Dallas Cowboys Cheerleaders, Dallas Cheerleaders, and Dallas Cowgirls have become identified in the public mind with plaintiff's cheerleader group. The evidence further shows that the Dallas Cowboys Cheerleaders uniform has come to be identified as the distinctive uniform of plaintiff's group, and is associated with the Dallas Cowboys Cheerleaders as distinguished from other entertainment groups. This identification and association have been acquired through use of the uniform in Dallas Cowboys Cheerleaders performances and appearances, both live and on television, over a period of about seven years, and through the use of the uniform in the licensed products already described.

It appears that the "world premiere" of Debbie Does Dallas occurred at the Pussycat Cinema at 49th and Broadway, New York City, in October 1978. Plaintiff entertained the hope that the film would promptly pass out of existence and that no court action would be required. However, the film kept showing in New York City, and plaintiff learned of the arrangements for distribution elsewhere. Therefore this action was commenced. At about this time the film was moved from Pussycat Cinema to a nearby theater, Pussycat Cinema 2.

The film Debbie Does Dallas lasts for 90 minutes. It has no other purpose than to display sex acts in minute detail. There are seven women involved in sex acts with various men. The episodes are strung together with what purports to be a kind of narrative. However, the narrative, and any dialogue which is presented, clearly have no purpose but to try to add to the titillation force of the sex acts.

The main character of the film is Debbie, played by one Bambi Woods. Debbie and six other girls are high school cheerleaders in a mythical town. The film starts with some brief scenes of the girls in their high school cheerleading uniforms (not resembling the Dallas Cowboys Cheerleaders uniforms). There are also scenes of some local high school football players. These scenes of the young men and women in their uniforms are full of suggestive sexual poses and talk, shortly followed by scenes of the girls in the nude in their locker room and shower room, where they are joined by some of the local football players also in the nude. In the midst of all this the "narrative" starts to develop. Debbie has been selected to become a cheerleader in Dallas. Although there is no explicit reference to Dallas Cowboys Cheerleaders as being the group she is to join, this idea is clearly intended to be conveyed to the viewer. As will be described, Debbie later appears in a uniform closely similar to that of the Dallas Cowboys Cheerleaders uniform.

Debbie needs to finance her trip to Dallas, and for some unexplained reason her six friends wish to accompany her to Dallas, and also need money for their expenses. They decide to offer sexual services to various local businessmen. These services are to be mainly of the unorthodox kind, since they wish to reserve regular forms of intercourse for their boy friends. The film shows six episodes of sex acts between the girls and the various men. The culminating episode is the last one involving Debbie. Debbie appears in a cheerleader's uniform which is obviously intended to be taken for the uniform of the Dallas Cowboys Cheerleaders, although there are some slight differences. She engages in a round of minutely depicted sex acts with a Mr. Greenfelt, a proprietor of a sporting goods store. During almost the entire sequence the film goes to great pains to have parts of Debbie's cheerleader uniform (resembling the Dallas Cowboys Cheerleaders uniform) in view.

The advertising and promotion of the film Debbie Does Dallas in New York City has consisted of materials displayed in front of the theaters, and advertising in newspapers.

While the film was playing at the original theater—Pussycat Cinema—there was a large marquee, each side of which contained a picture of Debbie in the uniform closely resembling the Dallas Cowboys Cheerleaders uniform. Also, the marquee contained the title of the film and the slogan "STARRING EX DALLAS COWGIRL CHEERLEADER BAMBI WOODS." Below the marquee, on each side of the theater entrance, was a large poster showing Debbie in the same uniform appearing on the marquee, with even more emphasis upon the features of the Dallas Cowboys Cheerleaders uniform. On these posters there was a quotation from Sir Magazine, starting with the phrase "Cheers for X–Dallas Cowgirl Bambi Woods!"

The film was advertised in certain New York newspapers. Prominent in the advertisements was the uniform. The advertisements also contained the slogan "YOU'LL DO MORE THAN CHEER FOR THIS X DALLAS CHEERLEADER!"

When the film moved to Pussycat Cinema 2, the marquee on the theater was smaller. The pictures of Debbie in uniform were omitted from the marquee, as were the slogans containing the phrase "Ex Dallas Cowgirl Cheerleader." However, below the marquee, beside the theater door, was one of the large posters with the uniform. On another large poster over the theater door was the legend "Starring Texas Cowboys Cheerleader Bambi Woods." One or more other posters contained the phrase "Cheers for X–Dallas Cowgirl Bambi Woods!" quoted from Sir Magazine.

Bambi Woods is not now, and never has been, a Dallas Cowboys Cheerleader.

One preliminary issue in this case has involved the relationship between defendant Zaffarano, the corporation Pussycat Cinema, Ltd., and the Pussycat Cinema theaters. For reasons which I stated at the hearing of February 16, I find that defendant Zaffarano is, and at all relevant times has been, the principal of Pussycat Cinema,

Ltd.; that Zaffarano is the operator of both Pussycat Cinema and Pussycat Cinema 2; that Zaffarano uses the corporation Pussycat Cinema, Ltd. for various purposes in connection with the operation of these two theaters. Both Zaffarano and Pussycat Cinema, Ltd. are proper subjects of any injunction directed against the showing and advertising of Debbie Does Dallas at either Pussycat Cinema or Pussycat Cinema 2.

I now find, in addition, that there is sufficient evidence to show that defendant Zaffarano is the producer and distributor of Debbie Does Dallas. Although Zaffarano has invoked his Fifth Amendment privilege when asked about whether he performs these functions, the evidence as a whole shows that he does so. His attorney admitted at one point that he is the producer. There is no indication that Zaffarano obtains the film for exhibition from anyone else but himself. A reasonable inference from the evidence is that Zaffarano is responsible for both producing the film and distributing it in New York and other cities throughout the country.

## II.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides:

"(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of

any such false description or representation."

New York General Business Law § 368–d, known as the Anti-dilution Law, provides:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

Jurisdiction of the Court over this case exists by virtue of a claim under federal, diversity of citizenship, and pendent jurisdiction.

Plaintiff contends that the names Dallas Cowboys Cheerleaders, Dallas Cheerleaders, and Dallas Cowgirls, and also the uniform, have acquired the status of common law service marks and trademarks.

Plaintiff contends that the showing and advertising of Debbie Does Dallas involves the misappropriation of plaintiff's service marks and trademarks, and further creates a misleading and confusing association of Debbie Does Dallas with plaintiff's cheerleader group, in violation of Section 43(a) of the Lanham Act. Plaintiff further contends that the showing and advertising of Debbie Does Dallas dilutes the quality of plaintiff's trade name and service marks and trademarks in violation of New York General Business Law § 368–d.

Defendant Zaffarano's approach to the case focuses primarily on the film itself. The defense contends that the film is a parody or satire on female cheerleaders, and that, even though there is some reference to Dallas and some use of a uniform similar to that of the Dallas Cowgirls Cheerleaders in the film, no one could rationally believe that the film originated with plaintiff or is associated with plaintiff. The defense contends that the film violates neither of the statutes referred to, and is protected by the First Amendment.

As to the promotion and advertising, the defense basically contends that, since there is a right to show the film, there is a right to advertise it, and this includes the right to use any elements of the film including the portrayal of the uniform. The defense denies that the uniform is a valid service mark or trademark. The defense does not deny that the names Dallas Cowboys Cheerleaders, Dallas Cheerleaders, and Dallas Cowgirls are common law service marks and trademarks belonging to plaintiff. However, the defense argues that the advertising and promotion of the film do not violate any of plaintiff's rights in these marks, although the defense appears to concede that certain of the slogans may be misleading in indicating that Bambi Woods is or was a Dallas Cowboys Cheerleader.

The defense argues that, even if certain elements of the advertising and promotion should be enjoined, the injunction should not reach the film itself.

### III.

We come to the question of whether plaintiff has a valid common law trademark and service mark in the uniform of the Dallas Cowboys Cheerleaders.[2] Both federal law and New York law define "trademark" as meaning any word, name, symbol or device or any combination thereof adopted and used to identify the goods of one party to distinguish them from those made or sold by others. 15 U.S.C. § 1127; New York General Business Law § 360(a). The term "service mark" is defined as any mark used in the sale or advertising of services to identify the services of one party and distinguish them from the services of others. 15 U.S.C. § 1127; General Business Law § 360(a–i).

█ Entertainment is considered a service in connection with the law of service

marks. *Miss Universe Inc. v. Patricelli*, 408 F.2d 506 (2d Cir. 1969).

Defendant Zaffarano contends that the Dallas Cowboys Cheerleaders uniform cannot be a valid mark because the uniform is used as clothing, and is not an emblem or ornament separate and apart from the clothing. The defense argues that the uniform is functional, and functional features cannot be protected as marks, even though they may acquire a secondary meaning.

█ I reject these arguments. It is true, of course, that the Dallas Cheerleaders uniform serves the function of clothing to cover the body in such a way as to permit cheerleading and dance routines to be performed. However, the specific elements of the uniform—their color, design, and ornamentation—are distinctive and arbitrary, and thus susceptible of becoming a valid trademark and service mark. *Cf. Application of Mogen David Wine Corp.*, 328 F.2d 925 (Cust.Pat.App.1964); *Application of World's Finest Chocolate, Inc.*, 474 F.2d 1012 (Cust.Pat.App.1973); *Fotomat Corp. v. Cochran*, 437 F.Supp. 1231 (D.Kan.1977). The specific uniform selected and used by plaintiff is only one of many which can be used for cheerleaders.

█ The evidence shows that plaintiff, through promotion and use of the uniform, has established a strong identification between the uniform and the particular entertainment furnished by the Dallas Cowboys Cheerleaders, as distinct from cheerleading or other entertainment furnished by other parties, and also identifying the particular products licensed by plaintiff. Thus, the evidence shows that the uniform has acquired a secondary meaning associated with the Dallas Cowboys Cheerleaders. *See Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1219 (8th Cir.), *cert.*

**2.** Plaintiff has filed an application for federal service mark registration of its uniform design. This application is now pending. However, the issue in the present case about the uniform is whether it has the status of a common law service mark and trademark. To recover for a violation of Section 43(a) of the Lanham Act, it is not necessary that there be a registered

trademark or service mark. *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1008 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98, *reh. denied*, 423 U.S. 991, 96 S.Ct. 408, 46 L.Ed.2d 312 (1975). The same is true of the New York Anti-dilution Law, as it specifically states.

*denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *Fotomat Corp. v. Cochran*, 437 F.Supp. 1231 (D.Kan.1977).

■ Defendant Zaffarano argues that color may not be trademarked. While a person cannot acquire a trademark by color alone, color taken in connection with other characteristics can be an element of a trademark. *Quabaug Rubber Co. v. Fabian Shoe Co., Inc.*, 567 F.2d 154, 161 (1st Cir. 1977); *Campbell Soup Co. v. Armour Co.*, 175 F.2d 795 (3d Cir.), *cert. denied*, 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949).

I hold that the Dallas Cowboys Cheerleaders uniform is a valid trademark and service mark belonging to plaintiff.

### IV.

This leads to the basic question of whether the film Debbie Does Dallas, or its advertising and promotion, or both, violate Section 43(a) of the Lanham Act.

■ Section 43(a) of the Lanham Act makes illegal the use of "a false designation of origin" with respect to goods or services, "or any false description or representation, including words or other symbols tending falsely to describe or represent" the goods or services. The statute is not limited to false designations of origin, but is directed also to any other false or misleading description regarding the character or nature of the goods or services. 1 R. Callman, Unfair Competition, Trademarks and Monopolies, § 18.2(b), at 622–23 (3d ed. 1967).

■ In order to obtain a remedy under Section 43(a), it is not necessary to show that anyone has actually been deceived. The courts have interpreted the statute as applying to situations where the misleading description or designation has a tendency to deceive, or is likely to cause confusion. *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160 (2d Cir. 1978); *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288 (S.D.N.Y.1972).

■ There is no requirement that the defendant's service or product be in direct competition with, or be of the same type as, the product or service of the plaintiff. The owner of a service mark or trademark basically has the right, as far as commercial exploitation is concerned, to have that mark associated with *his* services and goods, rather than with the services or goods of another person. This is true whether or not the party who misappropriates the mark deals in competing or non-competing services or goods. *Professional Golfers Association of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 669–70 (5th Cir. 1975). Occasionally the misappropriation of a mark is used in connection with goods or services which the customers of the true owner of the mark would find repugnant. This presents a special threat to the good name and goodwill of the true owner. *Benson v. Paul Winley Record Sales Corp.*, 452 F.Supp. 516 (S.D.N.Y.1978); *Coca Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972).

■ Literal falsity of a description is not required for violation of Section 43(a). Innuendoes, indirect intimations, ambiguous suggestions are all covered by the statute. *American Home Products Corp. v. Johnson & Johnson, supra* at 165.

■ In considering the question of whether there is a tendency to deceive or a likelihood of confusion within the purview of the statute, it must be realized that the buying public includes the unthinking and the credulous. The public cannot be expected to analyze or carefully weigh what is presented to them in promotion and advertisements. The question is what is the likely ultimate *impression*, upon customers and potential customers of the relevant services and products which will be created by what is said and what is reasonably implied. *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674–75 (2d Cir. 1963); *Coca Cola Co. v. Gemini Rising, Inc., supra* at 1190.

The rule has been applied in numerous Section 43(a) cases that where the evidence shows "that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name and good trade which another has built up,

then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); *Mortellito v. Nina of California, Inc., supra* at 1294. This reasoning coincides closely with a statement of Judge Learned Hand, explaining why the owner of a trademark should have a remedy against misappropriation in connection with non-competing goods:

"Therefore it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an ironmonger use his trade-mark? The law often ignores the nicer sensibilities.

However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." *Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928).

■ It would appear obvious that Section 43(a) of the Lanham Act applies to a motion picture. A misuse of trademarks or service marks, and deception or confusion of the kind prohibited by the statute, may occur in connection with the title of a movie, its advertising or in the content of the movie itself. *Cf. Edgar Rice Burroughs, Inc. v. Manns Theatres*, 195 U.S. P.Q. 159 (C.D.Cal.1976); *National Lampoon v. American Broadcasting Co., Inc.*, 376 F.Supp. 733 (S.D.N.Y.), *aff'd per curiam*, 497 F.2d 1343 (1974).

■ It has been long settled in our jurisprudence that the rights of free expression, embodied in the First Amendment and other legal doctrines, are subject to rights under the copyright and trademark laws. In the copyright area, one means of accommodation between the conflicting interests is the "fair use" doctrine, which permits certain use of copyrighted material to be made for purposes such as news reporting, criticism, scholarship—and parody and satire. *Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir.), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir.), *cert. denied* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964).

The "fair use" cases note the historic importance and social value of parody and similar forms. However, the cases also make it clear that there are limits on what can be done under the name of parody or satire. For instance, where the defense of "parody" is invoked in bad faith to justify a substantial copying of the original, the defense will be rejected. *Hill v. Whalen & Martell, Inc.*, 220 F. 359 (S.D.N.Y.1914), cited with approval in *Berlin v. E. C. Publications, Inc., supra.*

Defendant Zaffarano argues that the doctrine of "fair use" is applicable in a trademark case and that the movie Debbie Does Dallas is a parody or satire not subject to legal restriction.

In the trademark field there does not appear to be any well-defined doctrine of "fair use." However, in a case arising under New York General Business Law § 397 (use of the name, symbol or device of a nonprofit organization), the Appellate Division, in an opinion by Presiding Justice Botein, held that a fictional movie about Notre Dame University and its football team (a low-level satire) could not be enjoined.

*University of Notre Dame du Lac v. Twentieth Century-Fox Film Corp.,* 22 A.D.2d 452, 256 N.Y.S.2d 301 (1st Dept.), *aff'd,* 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965). The court laid great stress upon the First Amendment interests, and cited the Second Circuit copyright "fair use" decision of *Berlin v. E. C. Publications, Inc., supra.* The possible application of a "fair use" doctrine in the law regarding trade names and trademarks is further indicated in *Girl Scouts of the United States v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228, 1235 (S.D.N.Y.1969).

I will assume that there are forms of expression in which the name and uniform of the Dallas Cowboys Cheerleaders would be depicted, which could not be successfully attacked under the Lanham Act and the New York Anti-dilution Law. It would be totally inappropriate to try to spell out here the boundaries of such lawful forms of expression. However, I will assume that they would include, subject to appropriate standards, news coverage, criticism, and parody and satire. *Cf. Walt Disney Productions v. The Air Pirates,* 581 F.2d 751, 759 (9th Cir. 1978).

 However in the present case I reject defendant Zaffarano's theory that Debbie Does Dallas is protected by a "fair use" rule relating to parody or satire, because I find that the movie is in no sense a parody or satire.

A parody is a work in which the language or style of another work is closely imitated or mimicked for comic effect or ridicule. A satire is a work which holds up the vices or shortcomings of an individual or institution to ridicule or derision, usually with an intent to stimulate change; the use of wit, irony or sarcasm for the purpose of exposing and discrediting vice or folly.

In the present case, there is no content, by way of story line or otherwise, which could conceivably place the movie Debbie Does Dallas within any definition of parody or satire. The purpose of the movie has nothing to do with humor; it has nothing to do with a commentary, either by ridicule or otherwise, upon the Dallas Cowboys Cheer-

leaders. There is basically nothing to the movie Debbie Does Dallas, except a series of depictions of sex acts. The other phases of the movie—the dialogue and the "narrative"—are simply momentary and artificial settings for the depiction of the sex acts.

The associations with the Dallas Cowboys Cheerleaders obviously play an important role in the film and in the advertising; but this is a role that has nothing to do with parody or satire. The purpose is simply to use the attracting power and fame of the Dallas Cowboys Cheerleaders to draw customers for the sexual "performances" in the film. The obvious intent of defendant Zaffarano and the others responsible for this film is to cash in upon the favorable public image of the Dallas Cheerleaders, including the image of a particular quality of feminine beauty and character.

Defendant argues that there is, at most, only a minor association with the Dallas Cheerleaders in the movie, since the scene with Debbie performing sex acts partly clothed in the Dallas Cheerleaders uniform is only a small part of the film. This is unrealistic. Debbie's "performance" is the culmination of the film. It is Debbie and her selection to be a cheerleader in Dallas (obviously a Dallas Cowboys Cheerleader) which gives rise to the title, and the opportunity to display the uniform prominently in the advertising as well as to use the various slogans associating the film with the Dallas Cheerleaders.

In this connection, it is apparent that the movie and the advertising are intended to be closely connected, and are in fact closely connected. If injunctive relief is merited, it is not appropriate to limit such relief solely to the advertising, as defendant Zaffarano suggests. The use of the associations with the Dallas Cheerleaders both in the film and in the advertising, all have the single purpose of exploiting the Dallas Cheerleaders' popularity in order to attract customers to view the sex acts in the movie.

The next question is whether there is a sufficient showing of likelihood of deception or confusion to bring the case within Sec-

tion 43(a) of the Lanham Act. In this connection, the starting point is the fact that defendant Zaffarano and the others responsible for this film have deliberately attempted to cash in on the Dallas Cheerleaders' popularity and attracting power. Under such circumstances an inference of likelihood of confusion can readily be drawn. *Fleischmann Distilling Corp. v. Maier Brewing Co., supra; Mortellito v. Nina of California, Inc., supra.*

The Dallas Cowboys Cheerleaders are in the commercial entertainment field. Their performances involve particular types of displays of feminine beauty. As has been described, plaintiff's trade names and distinctive uniform have become symbols closely linked with plaintiff in the minds of millions of persons.

It is not difficult to conceive of the possibility that the use of plaintiff's trademarks by the makers of a movie would subtly suggest that the movie is sponsored by plaintiff, or that plaintiff's cheerleaders are performing in the movie. After all, the public might readily accept the idea that plaintiff has gone into a new and related entertainment venture—the production of motion pictures featuring members of the cheerleading group.

In the present case, I find that the movie Debbie Does Dallas and its advertising create a likelihood of confusing members of the public as to the sponsorship of the movie by the Dallas Cowboys Cheerleaders and the participation of a member of the group in the film. Consequently I hold that Debbie Does Dallas and its advertising violate Section 43(a) of the Lanham Act.

I also find that the showing and advertising of Debbie Does Dallas threaten irreparable harm to plaintiff. It is apparent that defendant Zaffarano, if not enjoined, will not only resume the showing of the film in New York, but will arrange for its distribution and exhibition throughout the country. It follows from the findings I have already made that these activities threaten widespread confusion in the public mind as to the association of plaintiff and its cheerleaders with pornographic films. The harm to plaintiff's reputation and standing is obvious.

### V.

I also hold that plaintiff has made out a valid case under the New York Anti-dilution Law. Defendant Zaffarano, and the others associated with him in the production, distribution and promotion of Debbie Does Dallas, have willfully misappropriated plaintiff's trade names and trademarks and service marks. If such activities are allowed to continue, there will inevitably be a dilution, or whittling down, of the reputation and good will associated with plaintiff's names and marks. It is now settled that confusion is not an element of a cause of action under the Anti-dilution Law. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544, 399 N.Y.S.2d 621, 628, 632, 369 N.E.2d 652 (1977).

The then District Judge Gurfein in *Mortellito, supra* at 1296, aptly summarized the difference between the concepts of dilution and confusion as follows:

"Dilution is an injury that differs materially from that arising out of the orthodox confusion. Even in the absence of confusion, the potency of a mark may be debilitated by another's use. This is the essence of dilution. Confusion leads to immediate injury, while dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark."

Dilution, in the sense described, is clearly present here.

### VI.

Defendant Zaffarano contends that the relief sought by plaintiff is precluded by two Supreme Court cases—*Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 83 S.Ct. 1868, 10 L.Ed.2d 1050 (1964) and *Compco Corp. v. Day-Bright Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). The defense makes two specific points: (1) that the doctrine of these cases precludes

application of the New York Anti-dilution Law; and (2) that the cases preclude a holding that the Dallas Cheerleaders' uniform is a valid trademark and service mark.

Basically, these cases hold that, where it is found under federal law that a party does not have a valid patent on the design of a product, state unfair competition law cannot be invoked to prevent the copying of the design. This is true, even if the design has acquired a secondary meaning associating it with a particular manufacturer.

■ The essential point is that the *Sears* and *Compco* cases deal with the exclusivity of federal *patent* law. The cases do not deal with the law relating to trade names and trademarks. It has long been recognized that in the area of trade names and trademarks remedies may be granted by both federal law and state law concurrently. It is clear that the federal law, embodied in Section 43(a) of the Lanham Act, does not preclude application of the New York Anti-dilution Law.

■ As to the effect of *Sears* and *Compco* on the validity of the uniform as a trademark and service mark, there is no indication in either of these cases that they would prevent an entertainment group from acquiring valid marks by the use of a distinctive uniform.

## VII.

■ A preliminary injunction should be issued against defendant Zaffarano prohibiting further distribution and advertising of Debbie Does Dallas. The facts are basically undisputed. The questions are ones of law, and of what ultimate inferences are to be drawn from the undisputed facts. In my view, plaintiff has made a showing on the merits which would probably justify final injunctive relief. Certainly a preliminary injunction is warranted.