**WENDY'S INTERNATIONAL, INC., Plaintiff,**

**v.**

**BIG BITE, INC., Defendant.**

**No. C–2–83–1184.**

United States District Court, S.D. Ohio, E.D.

Aug. 18, 1983.

---

John W. Zeiger, Columbus, Ohio, for plaintiff.

John J. Chester, Paul G. Lukeman, Columbus, Ohio, for defendant.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

This is a trademark infringement action under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In reality it is the latest in a series of "burger wars" which have broken out among the country's purveyors of fast

food. This particular battle is being fought over a rather clever television commercial in which Big Bite, Inc., a relatively small restaurant chain, parodies a number of popular promotional characters used by its larger and better known competitors. Among these characters is "Little Wendy," a pigtailed, frecklefaced young girl whose smiling countenance graces the front of untold numbers of fast food franchises owned and/or operated by Wendy's International, Inc. Little Wendy's guardians apparently do not think that Big Bite's parody is very funny, and they have voiced their displeasure over it loudly and with great fanfare. In the same manner, they have also filed this lawsuit.

Like its predecessors, this "war" is being fought in the courtroom of a busy federal judge, and the parties have probably paid dearly for their respective armies of lawyers and expert witnesses. Regardless of which side prevails on the merits, however, neither of the combatants will come out a total loser, because, as both well know, they stand to gain thousands of dollars worth of free publicity from the attention this dispute has generated. Consequently, the only true casualties of this war will be those who are trying to move more important matters through the Court's crowded docket. Nonetheless, because Wendy's has presented a colorable claim for preliminary injunctive relief under the Lanham Act, the Court is obliged to respond. Accordingly, the Court's findings and conclusions follow. See Fed.R.Civ.P. 65(d).

## I

The pertinent facts are largely undisputed. Plaintiff Wendy's International, Inc. is a popular and highly successful fast food chain which specializes in "old-fashioned" hamburgers. Little Wendy is the primary trademark of Wendy's International, and she has been duly registered as a service mark with both the federal government and the State of Ohio. See Plaintiff's Exhibits (PX) 23–25 and 27–31. Wendy's has also registered the slogan "ain't no reason to go any place else." PX 26. This slogan was used in conjunction with Little Wendy in a relatively recent Wendy's ad campaign which, aside from being very successful, was also the bane of various and sundry grammarians throughout the nation. It has since been discontinued.

Defendant Big Bite, Inc. is a relatively new restaurant chain which specializes in pita bread sandwiches. On or about June 22, 1983, it began airing a television commercial which pokes fun at Wendy's and other fast food chains, as well as each chain's mascot. The commercial features, in order, the likenesses of Colonel Sanders of Kentucky Fried Chicken fame, Little Wendy, and Ronald McDonald of the McDonald's chain. All three appear to be in the process of ordering and/or eating a Big Bite sandwich, and each makes some comment reminiscent of a slogan or phrase which has been drilled into the public's collective consciousness by the advertising of each character's respective restaurant chain. In the segment lampooning Wendy's, for instance, a cute pigtailed little girl looking very much like Little Wendy smiles rather mischievously at the camera and says, "Ain't no reason to go any place but Big Bite," or words to that effect. The commercial also shows a small, brooding child who proclaims matter-of-factly that "Broiling may beat frying, but Big Bite beats them both," or words to that effect. This is obviously a slap at a recent series of ads by the Burger King chain in which the virtues of broiled hamburgers versus fried hamburgers were extolled ad infinitum.

There is no question that the Big Bite commercial is intended to parody the ad campaigns of other fast food chains, and in so doing the commercial uses trademarks normally associated with its main competitors. Although a number of witnesses at the preliminary injunction hearing attempted to point out subtle differences between the characters which appear in the commercial and their trademark counterparts, such differences, if any, are minimal. Indeed, the producers of the commercial appear to have gone to great lengths to mimick the Little Wendy mark down to its most minute

detail. There is little doubt, therefore, that the ad uses one or more of Wendy's registered trademarks, and that such use is intentional.

Big Bite's reasons for running the commercial are readily apparent. By making fun of Big Bite's already famous competitors, the commercial draws attention to the fact that Big Bite products are somewhat different from the fare normally offered in more traditional fast food restaurants. According to Dr. Roger D. Blackwell, a professor of marketing who testified at the preliminary injunction hearing, Big Bite's use of humor in the ad also helps cut through the "clutter" caused in viewers' minds by constant exposure to advertising of all sorts. In short, the commercial is very effective.

There is also evidence to indicate that Big Bite management and the advertising agents who worked on the commercial were well aware of the free publicity which would result if the ad touched off another "burger war." Brantley Claris, the advertising executive who created the commercial, testified that although every effort was made to insure that nothing in the commercial was "actionable," the competitive advertising of other restaurant chains and the possibility of being sued by one of the featured competitors was actively discussed in her meetings with Big Bite officials. *See* Claris deposition at 56–58. She admitted, in fact, that someone at one of the meetings remarked, "maybe the publicity would do us some good if they did sue." *Id.* at 66.

The commercial was first aired on a number of television stations in Big Bite's main markets, Indianapolis and Columbus. Shortly thereafter, Gilbert S. Simon, a member of Wendy's corporate legal staff, telephoned Big Bite's general counsel and, demanded that the commercial be withdrawn. Affidavit of Simon at 3. He followed his call up with a letter to Charles L. Rioux, Big Bite's president, making essentially the same demand. *Id.* This letter was dated June 23, but it apparently was not actually received by Rioux until June 29. At about this same time, Wendy's released the text of this letter to the press, and the media began reporting the conflict. *See* Simon affidavit at Exhibit F.

Although Rioux made a number of public statements about the letter during the next few days, he apparently did not respond to it, and Big Bite did not take its commercial off of the air. Wendy's thereafter filed this lawsuit and moved for a temporary restraining order (TRO) on Friday, July 1. At 3:10 p.m. that afternoon counsel for Wendy's notified a Big Bite officer that a TRO motion had been filed, but, given the late hour and the upcoming holiday weekend, Big Bite was either unable or unwilling to send a representative to meet with the Court and opposing counsel at that time. The Court then considered Wendy's motion *ex parte* but refused to rule on it without first giving Big Bite another opportunity to appear and be heard. A TRO meeting was set for July 5.

On July 5, a short hearing was held, and the Court received a limited amount of evidence. Immediately thereafter the Court issued a brief order which prohibited Big Bite from running its commercial unless a relatively detailed visual and oral disclaimer was added. Big Bite immediately ceased using the commercial, but within approximately a week, it began airing a revised version which reflected the Court-ordered changes. The Court's disclaimer was presented in a rolling scroll-like manner on the video portion of the ad, and it was also recited quickly but distinctly by a male narrator. Since this procedure consumed approximately 8½ seconds of the ad's 30-second life, the Colonel Sanders caricature was cut out entirely.

A hearing on Wendy's motion for a preliminary injunction was held on July 22. Because it lasted longer than anticipated, and because the Court was in the midst of two other trials, the hearing was continued and was ultimately completed during the evenings of July 25 and 28. Since then each side has submitted briefs on the motion, and it is now ripe for decision.

Wendy's contends that it is entitled to an injunction prohibiting Big Bite from televising the commercial in any form whatsoever, with or without a disclaimer. It argues that the ad, even as revised, violates the Lanham Act because it tends to create a false impression that Little Wendy and her owners sponsor, endorse, or are otherwise affiliated with Big Bite products. In the alternative Wendy's claims that it is entitled to injunctive relief under Ohio's trademark statutes and under the common law doctrine of dilution.

In its most recent memoranda, Wendy's also alleges that Big Bite is airing a 60-second radio spot which is substantially similar to the disputed television commercial. Although the radio ad obviously does not use the image of Little Wendy, it allegedly uses a number of Wendy's registered marks, including the "ain't no reason" and "hot n' juicy" slogans. This radio commercial is referred to in the proposed second amended complaint which was tendered on July 20, and Wendy's urges the Court to enjoin it, too. However, since Wendy's motion for leave to file the second amended complaint is still pending, and since there was little evidence, if any, at the preliminary injunction hearing regarding this particular ad or radio advertising in general, Wendy's claims in this regard are not properly before the Court. The Court will thus address only those claims which pertain to the television commercial.

## II

■ Unfortunately, limiting its consideration to the television commercial alone does not make the Court's task any simpler. As the Ninth Circuit has observed:

Trademark infringement is a peculiarly complex area of the law. Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity. The source of this difficulty is that each case involves an effort to achieve three distinct objectives which, to a degree, are in conflict. These are: (1) to protect consumers from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition. The third objective dictates a degree of restraint in the pursuit of the first two; the second can be pushed beyond the reasonable needs of the first; and each requires for its proper implementation the exercise of judicial intuition supported, to the extent possible, by relevant facts.

*HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 716 (9th Cir.1974).

Nowhere is this more true, perhaps, than in cases involving "comparative advertising." [1] Although it is fairly well established that an advertiser such as Big Bite may lawfully use a competitor's trademark for the purpose of comparing its wares directly to those of the competitor, *see, e.g., Smith v. Chanel*, 402 F.2d 562 (9th Cir. 1968), no uniform rule exists where, as here, the advertiser compares his goods to those of another implicitly or indirectly by using the other's mark in a satirical or humorous manner. In fact, the courts facing this issue have reached widely different results for widely different reasons. *Compare, e.g., Girl Scouts of USA v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228 (S.D.N.Y.1969) (no infringement by contraceptive ad showing pregnant Girl Scout with slogan "Be Prepared"); *Ringling-Brothers Barnum & Bailey Combined Shows, Inc. v. Chandris America Lines, Inc.*, 321 F.Supp. 707 (S.D.N.Y.1971) (no infringement in use of slogan "The Greatest Show on Earth Isn't"); and *Dr. Pepper Co. v. Sambo's Restaurants, Inc.*, 517

---

1. Wendy's claims that this is really not a "comparative advertising" case at all because the disputed commercial does not directly compare Big Bite and Wendy's products. By parodying Little Wendy, however, Big Bite is clearly implying that its products are superior to those normally promoted by the Wendy's chain. In this sense the commercial is comparative, albeit indirectly so.

F.Supp. 1202 (N.D.Tex.1981) (no infringement in use of slogan "Don't you want to be a Senior, too?"); with *Chemical Corp. of America v. Anheuser-Busch, Inc.,* 306 F.2d 433 (5th Cir.1962), *cert. denied,* 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963) ("Budweiser" mark infringed by use of slogan "Where there's life ... there's bugs"); *Coca-Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183 (E.D.N.Y.1972) (trademark infringed by poster substituting "Cocaine" for "Coke" in registered logo). The Court thus approaches this controversy with little in the way of specific guidance on the topic of indirect comparative advertising.

A few general guidelines can be distilled from the Lanham Act and the considerable body of case law which has developed around it, though. Section 43(a) of the Act states that:

> Any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words and symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). As stated by its drafters, the purpose of this provision is "to regulate commerce by making actionable the deceptive and misleading use of marks [and] ... to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks ...." § 45; 15 U.S.C. § 1127. Since this case involves the use of such "colorable imitations," there is little question that it falls squarely within the purview of § 43(a), and that this

Court is empowered to enjoin any violation thereof pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

The standards by which preliminary injunctive relief can issue under § 43(a) are also relatively clear, at least in this circuit. There must be a showing of (1) irreparable harm flowing from the alleged infringement; and (2) either (a) a likelihood of success on the merits, or (b) "sufficiently serious questions going to the merits to make them a fair ground for litigation" *plus* a balance of hardships tipping decidedly in favor of the movant. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 646 (6th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). Generally, the "likelihood of success" requirement is met if it is established that the alleged infringement creates "a likelihood of confusion" in consumers' minds regarding the source, endorsement, affiliation or sponsorship of a particular product. *Id.,* 670 F.2d at 647. *See also, WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084 at 1086 (6th Cir.1983); *Control Components v. Valtek, Inc.,* 609 F.2d 763, 770 (5th Cir. 1980); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–205 (2d Cir.1979). The irreparable harm element is ordinarily presumed from a finding of probable confusion, but it may also be inferred from the plaintiff's financial interest in the affected trademark and the expense which has been incurred in promoting it. *Compare Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.,* 428 F.2d 379, 381 (2d Cir.1970); *Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1024 (7th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); and *Frisch's, supra,* 670 F.2d at 651.[2]

---

**2.** As the citation above suggests, both the Second and the Seventh Circuits engage in a presumption of irreparable harm once the requisite likelihood of confusion has been established. This is because "the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law."

*Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982). It is difficult to say whether such a presumption is applicable in the Sixth Circuit, though, for the *Frisch's* opinion, *supra,* leaves this point somewhat unclear. Nonetheless, the *Frisch's* court was willing to infer irreparable harm from the plaintiff's "substantial financial interest" in its

This general framework may place undue emphasis on protecting trademark owners at the expense of promoting free competition, especially where comparative advertising is involved. It nonetheless seems to be fully consistent with the approach taken in the comparative advertising cases cited above. Wendy's claim for injunctive relief under § 43(a) thus turns on (1) whether the commercial in question creates a reasonable "likelihood of confusion" amongst its viewers, and (2) if so, whether Wendy's stake in the infringed marks is great enough to render the harm occasioned by such confusion "irreparable" as a matter of law. The inquiry may well be somewhat different on Wendy's state and common law claims, but because the Court is compelled to answer both of the questions posed above in the affirmative, it need not address those claims at this time.

### A

■ Big Bite's commercial obviously is a light-hearted spoof on Big Bite's prime adversaries and the symbols associated with them, and it does not in any way misrepresent or make false statements about their products. Indeed, the commercial arguably is much less disparaging than one currently run by Wendy's in which the hamburgers sold by other fast food chains are mocked because they are pre-frozen. In the Court's opinion, the ad is relatively inoffensive and, as television commercials go, mildly entertaining.

Unfortunately for Big Bite, the Court cannot let its personal tastes dictate the outcome of this dispute, and the commercial must be judged from the perspective of a "reasonable consumer of average intelligence and experience." *New West Corp. v. Nym Co. of California, Inc.,* 595 F.2d 1194, 1202 (9th Cir.1979). This perspective generally precludes a detailed critical analysis of the ad in question, for as one court has put it:

trademark, and from the fact that "great expense" had been incurred in promoting the mark. 670 F.2d at 651. This Court assumes,

the buying public includes the unthinking and the credulous. The public cannot be expected to analyze or carefully weigh what is presented to them in promotion and advertisements. The question is what is the likely ultimate *impression,* upon customers and potential customers of the relevant services and products which will be created by what is said and what is reasonably implied.

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 467 F.Supp. 366, 374 (S.D.N.Y.), *aff'd.,* 604 F.2d 200 (2d Cir. 1979).

Under the "likelihood of confusion" test, moreover, Wendy's need show very little to justify its demand for an injunction. Although evidence of actual consumer confusion may be offered, such proof is not necessary to prevail on a preliminary injunction motion under § 43(a); a mere showing that the disputed advertisement "tend[s] to create a false impression" is enough. *Frisch's, supra,* 670 F.2d at 647; *see also, WSM, Inc. v. Tennessee Sales Co., Inc., supra,* at 1086–1087.

■ In addition, where it is shown that the alleged infringer used the movant's mark knowingly and with the intention of deriving some benefit from it, a strong inference of probable confusion arises, and all doubts are resolved against the defendant. *Id.,* 670 F.2d at 648–649; *see also HMH Publishing Co., Inc. v. Brincat, supra,* 504 F.2d at 720; *Dallas Cowboys Cheerleaders, etc., supra,* 467 F.Supp. at 374. This inference is plainly applicable here, for, as noted above, there is little question that Big Bite intentionally employed the "ain't no reason" logo and a Little Wendy lookalike to help break through the "clutter" created by other advertising. As a consequence, it derived a decided benefit from the use of Wendy's popular and universally recognized trademarks. The question thus becomes whether Big Bite has overcome the inference that its use of the disputed marks is likely to

therefore, that if a similar inference is supported by the facts in this case, then the irreparable harm prong of the *Frisch's* test is satisfied.

cause confusion among fast food customers. *See HMH Publishing, supra,* 504 F.2d at 720.

■ On the evidence before it, the Court thinks not. At the preliminary injunction hearing, both sides produced marketing surveys which purported to measure the amount of public confusion, if any, generated by the Big Bite commercial. Wendy's survey indicated that of those respondents who could recall seeing the commercial approximately 24 hours after it was shown, 53% correctly identified Big Bite as the sponsor, but a like number thought that one or more other fast food chains sponsored the commercial in conjunction with Big Bite or on their own. *See* PX 37 (McHugh Survey). On the other hand, Big Bite's survey shows that when asked whether the commercial gave them the impression that any of the other chains owned or were affiliated with Big Bite, only 3.3% of the respondents said yes. Of those asked whether the commercial gave them the impression that the other chains actually endorsed Big Bite products, 7.0% of all respondents answered affirmatively. Among those from 18 to 24 years old, however, this figure grew to 21.1%. DX 5 (Benson Survey).

At best these surveys are inconclusive, for both contain serious, if not fatal, flaws. The McHugh Survey employed a "recruited audience/24-hour recall" design which, perhaps unavoidably, did not attempt to control or take into account the number of frequency of television commercials seen by each respondent between the showing of the Big Bite ad and the follow-up call by survey staff members 24 hours later. In addition, the rather imprecise, open-ended questions used by the callers, coupled with their instructions to "probe" respondents until no further answers were forthcoming, seems likely to have prodded more respondents to identify multiple sponsors than might otherwise be the case. More importantly, the reliability of the entire survey

was placed in grave doubt when Big Bite's attorneys astutely demonstrated at the preliminary injunction hearing that the commercial in question was not even shown at many of the times indicated by McHugh's final report. *Compare* PX 37 at p. 2 *with* DX 1–3. The survey thus falls far short of satisfying the quantum of proof which would be necessary if Wendy's was required to prove actual public confusion.

The Benson Survey fares somewhat better but is still open to question. First, only persons within Franklin County, Ohio, were contacted, and all respondents less than 18 years old were somewhat arbitrarily disqualified. The demographic make-up of the survey respondents may thus differ considerably from that of the population of potential consumers in the relevant viewing areas. Second, the sample size was small, and, as is true of the McHugh Survey as well, the range of possible error is relatively high. Third, the Benson Survey does not measure potential confusion over who actually sponsors the commercial; apparently only those respondents who correctly identified the commercial as a Big Bite ad were included in the survey. Finally, at least one of the survey questions seems unnecessarily suggestive of a response favorable to Big Bite. *See* PX 5 at p. 2 (Question A110).[3] Hence, although the Benson Survey appears somewhat more reliable than its Wendy's counterpart, neither survey establishes with any certainty the existence and/or degree of actual consumer confusion *vel non.*

Taken together, however, the two surveys suggest rather broadly that at least a small percentage of the buying public is confused either about the true sponsor of the commercial or about the mock endorsements made therein. Even if the McHugh Survey is discounted completely, the Benson Survey indicates confusion regarding endorsements among 7.0% of all age groups and 21.1% of those between 18 and 24. PX 5 at p. 2. If accurate, or even

---

**3.** Question A110 reads as follows: "Does the commercial give you the impression that any of the other restaurant chains *actually endorses* the

Big Bite sandwich?" PX 5 at p. 2 (emphasis added). The use of the word "actually" plainly suggests a negative response.

approximate, these percentages translate into large numbers of confused consumers, especially among young adults who constitute a significant portion of the fast food market. Presumably there is some level at which actual consumer confusion should be considered "isolated" or *"de minimis,"* but neither side has offered any suggestion as to what that level should be in this case, and the Court would be quite reluctant, at least at this stage in the proceedings, to say that the percentages indicated by the Benson survey were insubstantial as a matter of law. *See Frisch's,* 670 F.2d at 648, n. 5; *see also, Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264, n. 13 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980) (suggesting that a consumer confusion level of 6.8% may be significant); *but cf. Dr. Pepper Co. v. Sambo's Restaurants, Inc., supra,* 517 F.Supp. at 1205–1206, n. 5 (suggesting that an 8% figure may not be significant).

The Court concludes, therefore, that at least a small percentage of actual consumer confusion is indicated by the two surveys presented at the preliminary injunction hearing. As noted above, neither of the reports is conclusive and both are subject to attack and/or revision if this matter proceeds to trial, but viewed in conjunction, they are sufficient to satisfy the relatively low threshold established by *Frisch's.*

This conclusion is buttressed by the fact that Wendy's and Big Bite are direct competitors in an industry with high volume sales and relatively low cost goods. If Big Bite were parodying the Little Wendy character in an effort to sell used cars, then it would be more difficult to find a likelihood of confusion since used cars are not substitutes for hamburgers, and since the degree of purchaser care in buying relatively expensive items such as automobiles is high. As the Sixth Circuit noted in *Frisch's,* though, buyers of fast food generally exhibit only a "casual" degree of care in selecting a particular restaurant, and the products promoted by such restaurants "are not likely to be the object of intense consumer research." 670 F.2d at 648.

In spite of its personal opinions, then, the Court must hold that Big Bite has failed to rebut the inference of consumer confusion created by its intentional use of Wendy's trademarks. Although the Court has less than the greatest confidence in the evidence presented here, enough of a "likelihood of confusion" has been shown on the record to satisfy the test articulated in *Frisch's.*

## B

■ Having thus found the requisite likelihood of confusion, the Court must turn next to the issue of irreparable harm. Fortunately this issue is much more easily resolved than its immediate predecessor.

As was discussed above, the irreparable harm requirement is overshadowed by the likelihood of confusion element, and in some circuits the former is almost automatically presumed if the latter is present. *See* n. 2, *supra.* In this circuit the standard appears more demanding, but it is still less stringent than that required in most other cases involving preliminary injunctive relief. Under *Frisch's* the movant need only show that it has actively promoted and protected the trademark at issue, and that it has a substantial financial stake therein. Once this is established, irreparable harm will be inferred since the damage caused by consumer confusion may be subtle and extremely difficult to quantify. *Id.*

Such an inference is plainly warranted here. Although there is no evidence that Big Bite's commercial has in any way damaged Wendy's trademarks or resulted in a loss of sales at Wendy's restaurants, it is undisputed that Wendy's has spent millions of dollars developing and promoting its trademarks, especially the Little Wendy mark. The goodwill built up around these marks is of enormous value, particularly in an industry such as this where buyers (and sellers) place great stock in easily recognized symbols. In a very real sense, Little Wendy means big business, and any damage generated by public confusion about her, however subtle, could well be substan-

tial and would almost certainly be difficult to measure.

Whether the damage is offset by the exposure Little Wendy has received as a result of this latest burger war is another question altogether. Nevertheless, it is clear that her guardians have satisfied the irreparable harm element of the *Frisch's* test. Wendy's is thus entitled to some form of injunction under § 43(a).

### III

 The only remaining question is precisely what form this injunction should take. The Court could, of course, allow the commercial to continue with either the present disclaimer or a new one, or it could prohibit Big Bite from continuing to use any Wendy's mark whatsoever. Wendy's urges this latter course, and in support has offered the testimony of Dr. Blackwell. Blackwell testified that, in his opinion, the disclaimer ordered by the Court actually draws undue attention to the commercial, especially in light of the public attention this dispute has received. He also opined that the disclaimer does not effectively alleviate any confusion which the commercial may create. This latter opinion appears to be supported by the data discussed *supra*, for both the McHugh Survey and the Benson Survey were based on the version of the commercial which contained the Court's disclaimer.[4]

The Court assumes that Big Bite would prefer to keep running the commercial as is. It has produced nothing to contradict Blackwell's testimony concerning the current disclaimer, however, nor has it proposed a more effective alternative. The Court thus has little choice but to grant the relief sought by Wendy's. 'Ain't no reason to do anything else.'

### IV

In accordance with the foregoing findings and conclusions, Wendy's motion for a preliminary injunction is GRANTED. Defendant Big Bite is hereby enjoined from airing the television commercial described above in its present form, or in any form which employs a Wendy's trademark or reasonable facsimile thereof. If another version of the commercial is run, it shall contain no reference whatsoever to Wendy's or any of its trademarks, either directly or indirectly.

This injunction shall take effect immediately, and defendant Big Bite shall make every effort to take its commercial off of the air in both Columbus and Indianapolis forthwith, but in no event shall said commercial be aired publicly after Sunday, August 21, 1983, at 12:00 midnight. Bond shall remain unchanged.

So ORDERED.

---

4. The Benson Survey was conducted well after the Court's disclaimer was added, but because it was not designed to pinpoint a particular viewing, it is impossible to tell whether the individual respondents had seen the original commercial, the disclaimer version, or both. Given the survey's rather late date, though, it seems likely that a majority of respondents had seen the disclaimer version at least once.