THIS OPINION
IS A PRECEDENT OF THE
T.T.A.B.

Hearing:                            Mailed:
December 4, 2008                    March 25, 2009
                                   jtw

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Chippendales USA, Inc.
_____

Serial No. 78666598
_____

Stephen W. Feingold of Day Pitney LLP for Chippendales USA, Inc.

Steven R. Berk, Trademark Examining Attorney, Law Office 108 (Andrew Lawrence, Managing Attorney).[1]
_____

Before Bucher, Walsh and Wellington, Administrative Trademark Judges.

Opinion by Walsh, Administrative Trademark Judge:

Chippendales USA, Inc. (applicant) has applied to register the mark shown here, also referred to as the "Cuffs & Collar Mark," for services now identified as, "adult entertainment services, namely exotic dancing for

_____

[1] Other examining attorneys handled this application prior to this appeal.

women in the nature of live performances" in International Class 41.[2]



The application describes the mark as follows: "The mark consists of a three-dimensional human torso with cuffs around the wrists and neck collar comprising of (sic) a bow tie. The dotted lines in the drawing indicate placement of the mark. The matter shown by the dotted lines is not claimed as a part of the mark and serves only to show the position of the mark." The application also includes the following statement: "Color is not claimed as a feature of the mark." The Cuffs & Collar Mark is a key part of the costume or uniform applicant's employees wear in rendering the identified adult entertainment service.

The Examining Attorney has finally refused registration on the ground that the mark is not inherently distinctive under Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§ 1051-1052, 1127. Applicant has appealed.

---

[2] Application Serial No. 78666598, filed on July 8, 2005, claiming first use anywhere and first use in commerce on January 1, 1979.

Applicant and the Examining Attorney have filed briefs, and both took part in an oral hearing on December 4, 2008.

We affirm.

Applicant operates the CHIPPENDALES dancers, a cast of exotic male dancers who claim to provide Broadway-show-like performances, across the United States and around the world.[3] Applicant claims that this was the first all-male, Las Vegas-style dance act. Applicant's show, first established in 1978, has been featured on a wide variety of television entertainment programs, talk shows, and it has been the subject of a popular parody on Saturday Night Live. Also, the sale of collateral goods, such as calendars and videos, are a critical part of applicant's marketing success. In 1979 applicant's performers began to wear the cuffs and collar without a shirt – the allegedly arbitrary imagery – that applicant claims has been the cornerstone of the company's promotional efforts since then. According to applicant's expert, Dr. Shteir, the Cuffs & Collar Mark "… is obviously an abbreviated form of black tie tuxedo dress." Shteir Dec. at 6. Dr. Shteir also states that the tuxedo is a "… symbol with strong associations to wealth and social prestige." *Id.*

---

[3] The identification of services in the application does not limit the services to those performed by male dancers.

3

Applicant renders its adult entertainment services nearly exclusively to female audiences. The male performers generally begin their performances wearing an "outer costume" in addition to the "cuffs and collar," including black trousers. *See*, *e.g.*, Shteir Dec., Exh. 1. The outer costume may also include other elements, such as the attire of a doctor, teacher, or member of the military to project a "fantasy." Applicant's Brief at 12. *See*, *e.g.*, Shteir Dec., Exh. 2 at 81. In the course of the performance the performers generally remove all clothing other than the "cuffs and collar" and a G-string; the performance emphasizes erotic movements. Though there is no nudity, the performances can be fairly characterized as a strip show. The performances also generally involve some physical contact between audience members and the performers. Indeed, the point of the performance is to provide a provocative, revealing, adult-entertainment experience for the audience focused on the minimal attire of the performers, or more accurately the maximum exposure of the performers' bodies.

By way of background, applicant has already registered this same Cuffs & Collar Mark for the essentially same services, that is, "adult entertainment services, namely exotic dancing for women," in Registration

No. 2694613 based on a claim of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f). In fact, that prior registration is not only active, but has achieved incontestable status under Trademark Act Section 15, 15 U.S.C. § 1065.

Applicant's purpose in filing the application at issue here is to secure a registration for the same mark, but without reliance on or reference to Section 2(f) and acquired distinctiveness. Applicant argues that we should entertain this issue because, as a result of actions by the assigned examining attorneys, applicant was denied the opportunity to secure a registration without reliance on Section 2(f) in the application which resulted in the issuance of Registration No. 2694613 and in a subsequent application. Applicant's objections to the handling of its prior applications are not before us in this case.[4] In this case, we will proceed to consider whether applicant's Cuffs & Collar Mark is entitled to registration on the basis that it is, or was, inherently distinctive.

---

[4] Applicant claimed that in the earlier applications it attempted to argue first that its mark was registrable on the basis that the mark was inherently distinctive, and in the alternative, that its mark had acquired distinctiveness, but that it was not permitted to do so.

However, while we will consider whether applicant is entitled to another registration for the same mark on the basis that the mark is inherently distinctive, we note that Registration No. 2694613 is entitled to the full benefits accorded all registrations under Trademark Act Section 7(b), 15 U.S.C. § 1057(b), as well as the additional benefits accorded incontestable registrations under Section 15. By rendering an opinion here, we do not intend to suggest that any registration which would issue without regard to Section 2(f) would afford applicant rights which would differ in any way from those rights which the existing registration, which does reference Section 2(f), already affords applicant.[5]

Furthermore, we note the challenging circumstances which attend any attempt to answer the question which this appeal poses, that is, whether applicant's mark is, or ever was, inherently distinctive. Applicant argues, and we agree, that we must consider whether applicant's mark was inherently distinctive at the time applicant began to use the mark nearly 30 years ago. However, applicant's use and promotion of its mark over 30 years since that time, along

---

[5] For the record, we reject out of hand the Examining Attorney's request that Registration No. 2694613 "be abandoned forthwith" in the event this application proceeds to registration. Examining Attorney's Brief at 3, n.2. The Trademark Act provides no such authority in deciding an ex parte appeal.

with its enforcement efforts, have undoubtedly had a major impact on relevant consumers' perception of the mark. As a result of that history, it is difficult, to say the least, to discern how relevant consumers would have perceived the mark at the time, before and in the absence of applicant's subsequent activities.[6]

Applicant filed the application resulting in Registration No. 2694613, apparently the first application applicant ever filed for the Cuffs & Collar Mark, on November 27, 2000, over twenty years after it began to use the mark. In acting on that application, the USPTO found applicant's claim of acquired distinctiveness sufficient to register the mark in Registration No. 2694613. Applicant's use and promotion of the mark has continued, totaling nearly 30 years to date. The record in this application includes evidence of further, extensive use and promotion of the mark, as well as evidence of applicant's aggressive and thorough efforts to enforce its rights in the mark. For example, in a declaration dated October 19, 2006, applicant's counsel discusses, "… an action [by applicant]

---

[6] We are not suggesting that registrability should be determined at any time other than at the time the application is pending. See *In re Thunderbird Products Corp.,* 406 F.2d 1389, 160 USPQ 730, 732-733 (CCPA 1969); *In re Minnetonka*, 212 USPQ 772, 777 (TTAB 1981). Theoretically, if the mark was inherently distinctive when applicant began use, it remained so thereafter.

in the District of New Jersey against a company using

CHICKENDALES on slot machines that also featured dancing

chickens wearing cuffs and collars."  Attachment to

Applicant Response dated October 23, 2006.

Turning to the merits, applicant argues that this is a

case of first impression and proposes that we adopt a new

test to determine whether its mark is inherently

distinctive.  Applicant proposes the following new test:

> The inquiry begins by asking two questions:
>
> 1.  Is the costume used in a channel of trade
> where consumers are conditioned through their
> past experience to presume a source
> identification function?
>
> 2.  Is the costume immediately associated
> with an iconic larger than life character
> where the costume acts as an intrinsic
> symbol for the character?
>
> If the answer to either question is yes, then
> the costume is inherently distinctive unless the
> costume is nothing more than a common depiction
> of a familiar symbol that preexisted the costume.
>
> If the answer to both (1) and (2) is no,
> then the costume is not inherently distinctive.

Applicant's Brief at 8-9.

We reject this suggestion.  However, we will discuss

the proposed test further below in conjunction with our

discussion regarding applicant's evidence.  In deciding

this appeal on the merits we will apply the test set forth

in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d

1342, 196 USPQ 289 (CCPA 1977), a test which the Board has applied effectively for more than 30 years in a wide variety of circumstances. Specifically, under *Seabrook*, we must consider the evidence related to applicant's Cuffs & Collar Mark and determine:

> 1. whether the Cuffs & Collar Mark is a common basic shape or design;
>
> 2. whether the Cuffs & Collar Mark is unique or unusual in the particular field;
>
> 3. whether the Cuffs & Collar Mark is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods or services viewed by the public as a dress or ornamentation for the goods or services; or
>
> 4. whether the Cuffs & Collar Mark is capable of creating a commercial impression distinct from any accompanying words.[7]

*Id.* at 291.

The Board has observed that subsequent cases serve to "complement" the test set forth in *Seabrook*, and thereby provide additional useful guidance. *In re Creative Beauty Innovations Inc.*, 56 USPQ2d 1203, 1206 (TTAB 2000). Accordingly, in our analysis we also look to more recent authoritative cases, including most notably the Supreme Court's opinions in *Wal—Mart Stores v. Samara Bros.*, 529 U.S. 205, 54 USPQ2d 1065 (2000), *Qualitex Co. v.*

---

[7] Factor 4 is not relevant in this case.

*Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161 (1995), and *Two Pesos Inc. v. Taco Cabana Inc.*, 505 U.S. 763, 23 USPQ2d 1081 (1992).

In *Two Pesos*, an infringement case arising under Trademark Act Section 43(a), 15 U.S.C. § 1125(a), the Supreme Court held that trade dress employed in the rendering of restaurant services could be, and in that case was, inherently distinctive. *Two Pesos Inc. v. Taco Cabana Inc.*, 23 USPQ2d at 1083.

Furthermore, at the risk of stating the obvious, while trade dress used with services *may be* inherently distinctive, not all such trade dress *is* inherently distinctive. The facts of each case dictate that determination. *In re File*, 48 USPQ2d 1365 (TTAB 1998) (trade dress for bowling alley services consisting of "tubular lights running lengthwise down bowling lanes projecting over the gutters" held not inherently distinctive because "… customers for bowling alley entertainment services would regard applicant's trade dress simply as an element of interior decoration and would not, therefore, immediately perceive such trade dress as a source indicator"); *In re Hudson News Co.*, 39 USPQ2d 1915 (TTAB 1996), *aff'd per curiam*, 114 F.3d 1207 (Fed. Cir. 1997) (two applications for trade dress for retail store

10

services held not inherently distinctive; the marks were described as, (1) "the color blue utilized as a motif in association with the store name and other trade dress elements such as carpeting, neon lighting, publication(s) display panels and surrounds, shelving and employee uniforms," and (2) "a cool bluish, clean and salubrious newsstand shopping environment. The blue motif is created and enhanced by blue neon lighting associated with the store name and publication(s) displays, blue carpeting, blue accents, and blue employee uniforms. The blue motif is further enhanced by extensive use of clear, acrylic plastic shelving and coverings for displays which both reflect and allow for the passage of the reflected bluish light throughout").

In *Wal-Mart*, another case under Section 43(a), the Supreme Court drew a distinction between trade dress residing in product packaging and trade dress residing in the design of the product itself, and held that packaging trade dress could be inherently distinctive while product trade dress could not. *Wal—Mart Stores v. Samara Bros.,* 54 USPQ2d at 1069. Rather, in the case of product design, the Court held that a showing of acquired distinctiveness is *always* required to establish trademark rights. *Id.* at 1068 -69.

While the Supreme Court observed that consumers may be predisposed to regard packaging for goods as an indicator of sources, the Court also recognized that there are cases where it is not reasonable to assume that predisposition. *Id.* at 1068.  In cases of trade dress used in connection with services, it is not feasible to  categorize such cases as either a "product" or "packaging" case.  Rather, we must simply assess whether it is reasonable to assume that the consumer is predisposed to view the trade dress as a source indicator.  See, e.g., *In re Hudson News Co.*, 39 USPQ2d at 1923.

Accordingly, as a threshold matter we find that the mark at issue here, like the service mark in *Two Pesos*, is a form of trade dress which *may be* inherently distinctive. Whether or not the Cuffs & Collar Mark is inherently distinctive is the question we must answer.

As a further threshold matter we note that the Examining Attorney does not bear a heavy burden in establishing a prima facie case that a mark is not inherently distinctive.  The Examining Attorney need only establish a "reasonable predicate" to make the necessary prima facie showing.  *In re Pacer Technology*, 338 F.3d 1348, 67 USPQ2d 1629, 1632 (Fed. Cir. 2003), *citing, In re Loew's*

12

*Theatres, Inc.*, 769 F.2d 764, 226 USPQ 865, 868 (Fed. Cir. 1985).

With that foundation, we will proceed to apply the *Seabrook* test to the evidence in this case.

The relevant *Seabrook* factors overlap to a great extent in this case. Indeed, the arguments of both applicant and the Examining Attorney, quite understandably, tend to blur the distinctions between the factors. Before discussing the specific factors, we will address the more significant arguments which relate to the *Seabrook* test generally.

Applicant argues that the Cuffs & Collar Mark is a "uniform," not a "costume," that the Cuffs & Collar Mark is highly unusual in that it separates the cuffs and collar from the shirt or other garment and that the Cuffs & Collar Mark had never before been used in rendering exotic adult entertainment services targeted to women.

In his brief and at oral hearing, the Examining Attorney argues that, inasmuch as the Office has demonstrated that it is not unusual, and even common, for exotic dancers to perform in various styles of exotic dress, this first prong of *Seabrook* is satisfied. The record includes examples of various provocative costumes exotic dancers may employ. *See, e.g.*, Applicant's

Response of June 19, 2007, Attachment from flirtylingerie.com.

Applicant, and to a lesser extent the Examining Attorney, devote significant attention to the costume/ uniform distinction.  Applicant argues from the premise that uniforms are more likely to be perceived immediately as source indicators, and therefore, are generally inherently distinctive.  Applicant argues that the Cuffs & Collar Mark is a uniform.  Applicant also argues, in the alternative, that even if the Cuffs & Collar Mark is a costume, that its evidence shows that it is nonetheless inherently distinctive.

We do not find the uniform versus costume distinction particularly helpful here - it begs the ultimate question. Furthermore, it leads to analysis which is too simplistic and facile.

For example, in posing the "uniform" argument applicant relies heavily on the opinion in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F. Supp. 740, 201 USPQ 740, 746 (S.D.N.Y. 1979).  Applicant argues that the Court found the uniforms of the Dallas Cowboys cheerleaders -- trade dress analogous to that before us -- inherently distinctive.  Applicant's Brief at 10.  The opinion does include some arguably ambiguous language on

this point in the statement: "… the specific elements of the uniform – their color, design, and ornamentation – are distinctive and arbitrary, and thus susceptible of becoming a valid trademark and service mark." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 201 USPQ at 746. Elsewhere the opinion is unambiguous in stating that the Court's basis for determining that the trade dress functioned as a mark was acquired distinctiveness, not inherent distinctiveness. Earlier in the opinion the Court states:

> The evidence further shows that the Dallas Cowboys Cheerleaders uniform has come to be identified as the distinctive uniform of plaintiff's group, and is associated with the Dallas Cowboys Cheerleaders as distinguished from other entertainment groups. This identification and association have been acquired through use of the uniform in Dallas Cowboys Cheerleaders performances and appearances, both live and on television, over a period of about seven years, and through the use of the uniform in the licensed products already described.

*Id.* at 744.

> Later in the opinion the Court also states:

> The evidence shows that plaintiff, through promotion and use of the uniform, has established a strong identification between the uniform and the particular entertainment furnished by the Dallas Cowboys Cheerleaders, as distinct from cheerleading or other entertainment furnished by other parties, and also identifying the particular products licensed by plaintiff. Thus, the evidence shows that the uniform has acquired a secondary meaning associated with the Dallas Cowboys Cheerleaders.

15

*Id.* 746-747. Thus, in this opinion, we find strong support for the proposition that "uniforms" of the general type at issue here are neither unusual nor inherently distinctive. We also note that certain other types of uniforms used in a commercial setting or in organizations like the military frequently include explicit source indicators, for example, company logos, insignia, or other similar material. Applicant's Cuffs & Collar Mark is devoid of any other explicit source indicators.

Applicant's alternative argument, based on the "costume" theory, relies heavily on *Red Robin Enterprises, Inc.,* 222 USPQ 911, 912 (TTAB 1984) for the proposition that, even if its Cuffs & Collar Mark is construed to be a costume, it too is inherently distinctive like the mark in *Red Robin*. However, applicant discounts significant differences between the cases. Most importantly we cannot discount, as applicant does, the Board's explicit reference to the fact that the costume included an "RR logo"; the Board states, "… if the costume in question is sufficiently distinctive (and we believe applicant's costume with its 'RR' logo and other unique features meets this requirement), it can and will serve to indicate the sponsorship or source of such services." *Id.* at 912. *Cf. In re DC Comics, Inc.,* 689 F.2d 1042, 215 USPQ 394 (CCPA

16

1982) (drawings of fictional comic characters held to function as trademarks for toy doll figurines of those characters); *In re Penthouse International Ltd.,* 565 F.2d 679, 195 USPQ 698 (CCPA 1977) (design of key may serve as trademark for jewelry, although jewelry product itself includes three-dimensional portrayals of mark); *In re Paramount Pictures Corp.,* 213 USPQ 1111 (TTAB 1982) (television character names determined to serve as a trademark although used and presented as major ornamentation for the decalcomania goods involved); *In re Florida Cypress Gardens, Inc.,* 208 USPQ 288 (TTAB 1980) (designation consisting of name of clown is registrable for entertainment services despite fact that name also identifies a fictitious character played by performers in applicant's shows).  Of course, the Cuffs & Collar Mark does not include any logo.  Accordingly, the *Red Robin* case and similar "costume" cases fail to support applicant's contention that the Cuffs & Collar Mark is an inherently distinctive costume.

Accordingly, for purposes of our analysis we will generally assume that applicant's Cuffs & Collar Mark is a uniform, though we find the distinction inconsequential.

Turning to the specific *Seabrook* factors, first we consider whether the Cuffs & Collar Mark is a common basic

shape or design.  The Examining Attorney points out that exotic dancers often start a show wearing some kind of outfits, for example, a stripper representing either a doctor wearing a stethoscope, or a construction worker wearing a utility belt, or a cowboy wearing chaps and a ten-gallon hat.  Applicant discounts these examples as inapposite.

In evaluating how the mark would have been perceived at the time applicant began to use it, we find relevant the fact that persons performing the same or similar adult entertainment services, whether male or female, routinely wear costumes or uniforms which are, above all, revealing and provocative.  Applicant does not seriously dispute the general proposition that adult entertainers wear revealing and provocative costumes, usually connected with some sort of fantasy.

The Examining Attorney provides examples of various provocative costumes in attachments to the Examining Attorney Office Action of December 18, 2006.  In fact, among the costumes available for purchase are a matching set of male and female costumes, each consisting of a cuffs and collar set and a G-string.  See Attachments to Office Action of December 18, 2006 from flirtylingerie.com,

costumzee.com and nextag.com.[8]  The Cuffs & Collar Mark fits well within the general type of costumes or uniforms in use in the field.  It evokes the fantasy of wealth and privilege, a man in a tuxedo, and it is revealing and provocative.

In sum, we conclude that the cuffs and collar costume/uniform, when viewed apart from applicant's use and promotion of the Cuffs & Collar Mark, is the same basic type of revealing and provocative attire worn by adult entertainers.  Thus, we conclude that, when viewed in context, the Cuffs & Collar Mark is a common basic shape or design.

Next we must consider whether the Cuffs & Collar Mark is or was unique or unusual in the particular field. The Examining Attorney argues again that the Cuffs & Collar Mark is not unique for these services inasmuch as it is of the same general type as others and not unusual in the field.  By contrast, applicant argues that, because all strippers begin their routine with some kind of fantasy outfit, these examples demonstrate non-trademark symbols for the easily-recognizable occupations of real life

---

[8] Our sense of propriety dictates that we not display these examples in this opinion.  Applicant alleges and we concede that all current examples of such costumes could be imitations of, or even infringements of, applicant's Cuffs & Collar Mark.

19

characters used as part of a story.  Applicant argues that this contrasts with the cuffs and collar expressly designed to be part and parcel of applicant's identity.  Applicant also argues that the mere fact that the utility belt, like the cuffs and collar, remains on the performer after the shirt is discarded does not compel a finding that its cuffs and collar are usual in the field of male exotic dancing.

The discussion above regarding "common designs" also points to the answer to the question as to whether applicant's mark was unique or unusual from the outset – the answer is no.  That is, as we noted, the Cuffs & Collar Mark is a simple variation on revealing and provocative costumes or uniforms generally in use in the adult-entertainment, exotic-dancing field.

Also, applicant's expert, Dr. Shteir, references an article which states, "The collar and cuffs [referring to applicant], *like the bunny suit which inspired them*, has become a trademark recognized, wherever women take their entertainment seriously, as a symbol of professional and classy sexy fun."  Shteir Dec., Exhibit 2 at 72 (emphasis added).  Thus, applicant's own evidence suggests that its Cuffs & Collar Mark, at its inception, was not something

20

new under the sun.[9]  Furthermore, among the examples of

exotic costumes in the Examining Attorney's evidence we

find an example of the "Sexy Bunny Costume," which

features, among other things, the cuffs and collar,

identical to applicant's Cuffs & Collar Mark.  See

Attachment to Office Action of December 18, 2006 from the

costumecraze.com site.  The female costume is based on the

Playboy Bunny costume.

In general, applicant assigns too much importance to

the fact that it was the first to use the cuffs and collar

without a shirt on male dancers performing for female

audiences.  While applicant may have been the first to do

so, the evidence stating that its costume was "inspired" by

the bunny costume, an artifact in adult entertainment,

suggests that applicant's Cuffs & Collar Mark was not

necessarily unique in the broader field of adult

entertainment when applicant adopted it.

Applicant emphasizes the distinction between its

services and adult entertainment services offered to men.

However, applicant takes this distinction too far.  We find

---

[9] At the oral argument, when we asked applicant's counsel about
the relationship between the Cuffs & Collar Mark and the cuffs
and collar used in the bunny costume, counsel was reluctant to
concede that the bunny costume even included the cuffs and
collar.  Applicant's own evidence provides a clear answer on this
point.

the evidence that the bunny costume predated and is referred to as inspiring applicant's Cuffs & Collar Mark relevant to our determination as to whether its mark was unique or unusual in the field.  However, we would reach the same conclusions with or without this evidence.

More importantly, even if applicant was the first, *and* the one and only, party to use the cuffs and collar uniform in the field, whether it be in the male or female adult entertainment field, that fact alone would not be sufficient to render it inherently distinctive.  *In re Hudson News Co.*, 39 USPQ2d at 1924.  The more important fact in our overall analysis is that the cuffs and collar are not unusual in the field of adult entertainment generally, nor in the field of adult entertainment for women.

In sum, we conclude that, at the time applicant began to use the Cuffs & Collar Mark it was not unique or unusual in the field.

Next we must consider whether the Cuffs & Collar Mark was a refinement of an existing form of ornamentation for the particular class of services.  We find that it was such a refinement for the same reasons, and based on the same evidence, discussed in our treatment of the first two factors.

22

Finally, with regard to the *Seabrook* factors, we have considered all relevant evidence and argument and conclude that the Examining Attorney has provided a reasonable predicate which is sufficient to establish a prima facie case that the Cuffs & Collar Mark is not inherently distinctive. We conclude further that applicant has failed to present sufficient evidence to establish that its mark was inherently distinctive at the time of adoption, and has not, therefore, successfully countered that predicate. *See, e.g.*, *In re Hudson News Co.*, 39 USPQ2d at 1924.

Before closing, for completeness, we wish to discuss further the evidence applicant has offered in support of its position. It is apparent that applicant has gone to considerable effort and expense to present this evidence. The evidence is presented, among other things, to support findings it urges us to make under its "new test" for inherent distinctiveness.

The centerpiece of applicant's evidence is the declaration of Dr. Shteir, an expert in the field of dramaturgy. We acknowledge that Dr. Shteir's credentials, both her education and experience in dramaturgy, are impressive. In her declaration, she provides interesting history and psychosocial analysis in fields as diverse as the origins of the tuxedo, the significance of striptease, the women's liberation movement, the symbolic impact of costumes and uniforms, and other fields.

Unfortunately, we find that her expertise and analysis ultimately have little probative value in relation to the question at hand, that is, whether the Cuffs & Collar Mark was inherently distinctive at the time applicant began to use it.

In her declaration Dr. Shteir indicates that she was instructed in relevant trademark subjects. However, the fact that she is not familiar with the field is evident. At one point in the declaration, Dr. Shteir states, "However, there is another independent reason that I believe unequivocally supports the finding that the mark [applicant's Cuffs & Collar Mark] is inherently *descriptive*." Shteir Dec. at 22 (emphasis added). The reference to "descriptive" is, most likely, an inadvertent slip; it is, nonetheless, indicative that Dr. Shteir is operating in an unfamiliar field, not one in which she is an expert. We note further that Dr. Shteir did not conduct any empirical research, difficult as that may be at this point in time, to determine how relevant consumers perceived the Cuffs & Collar Mark when applicant began to use the mark.

The ultimate point of Dr. Shteir's declaration, based on applicant's proposed test and applicant's theory of the case, is that the Cuffs & Collar Mark is an intrinsic symbol for the Chippendales dancer who, in turn, is an iconic larger than life character. Shteir Dec. at 17. As

such, Dr. Shteir opines that the Cuffs & Collar Mark is inherently distinctive.

In her analysis Dr. Shteir points to Mary Poppins as the quintessential "iconic character" and to her umbrella as an "intrinsic symbol" of that character. Dr. Shteir states, "Thus, just as the attributes of Mary Poppins are transferred to her umbrella, so, too, the fantasy attributes of the Chippendales dancer were transferred to the Cuffs and Collar outfit worn by the Chippendales dancers. Without the Cuffs and Collar, the dancer was just another guy wearing a G-string. With the Cuffs and Collar he became the perfect embodiment of the women's fantasy." *Id.* at 26.

We fail to see how the comparison of Mary Poppins with the Chippendales supports applicant's position. Dr. Shteir does not identify the service as to which the iconic Mary Poppins umbrella would immediately serve as a source indicator. Is the umbrella, as used in Mary Poppins, a service mark for any services? Is it in any way comparable to the way in which applicant uses its Cuffs & Collar Mark in connection with applicant's exotic dancers who render adult entertainment services on an ongoing basis? The fact that the cuffs-and-collar uniform may be "the perfect embodiment of the women's fantasy" does not lead to the

25

conclusion that it is an inherently distinctive service mark.

Even if we set aside the question of the validity of this comparison, we do not find this analysis to be in any way probative of the issue, that is, whether the Cuffs & Collar Mark is inherently distinctive.

On a superficial level the analysis elevates the adult entertainment service involved here to a status which is not congruent with reality. As the author Dr. Shteir references states, "The appearance of naked or near-naked men (whether for women or men) cannot, therefore, be understood as offering oppositional or taboo-breaking identities for the viewer as their display is always at the service of capitalism and its profiteers (Galloway, 1990)." *Id.*, Exh. 2 at 76. On an even more elemental level, in commenting on the Chippendales dancers Dr. Shteir herself states, "A major part of this fantasy was that these men were the perfect 'hunks' whose only interest was to please women and not themselves." *Id.* at 21. And finally, again the author Dr. Shteir references captures the essence of the Chippendale "phenomenon" by referring to the an "… acceptable female desire for male bodies." *Id.*, Exh. 2 at 71.

As we stated above, the point of the Chippendales' performance is to provide a provocative, revealing, adult-entertainment experience for the audience focused on the minimal attire of the performers, or more accurately the maximum exposure of the performers' bodies. We find nothing in Dr. Shteir's analysis or the other evidence which in any way alters the simple fact that the focus of the service at its inception was the bodies of the performers, not the particulars of their minimal attire.

Furthermore, applicant's other evidence, including the declarations of its performers, its competitors and its counsel, merely serve to support the conclusion that the Cuffs & Collar Mark has acquired distinctiveness, not that it was ever inherently distinctive.

Also, Dr. Shteir states, "However, in reviewing the history of the Chippendales, I remember that the Cuffs and Collar trade dress was not limited to the dancers themselves but also to the waiters serving the female patrons dinner before the show began." Shteir Dec. at 21 (footnote omitted). There is insufficient evidence in the record regarding the timing and other circumstances regarding this or other similar uses of the cuffs and collar to consider what impact any such use may have had on the relevant public. Even the affidavits from applicant's

own vice presidents, Mr. Denberg and Mr. Goldman, make no mention of such uses.

Accordingly, we conclude that the Cuffs & Collar Mark is not inherently distinctive.  However, the fact that applicant already owns an incontestable registration for the Cuffs & Collar Mark should serve as no small consolation in spite of our decision here.

**Decision**:  We affirm the refusal to register the mark under Trademark Act Sections 1, 2 and 45.

- o O o -

Opinion by Bucher, Administrative Trademark Judge, dissenting:

---

**"How many hunky seraphim can dance on the point of a needle?"**
-- *AN ANONYMOUS FOURTEENTH-CENTURY SOPHIST*

---

It is hard to argue with the compelling logic of the majority's final point:  what purpose is served by prosecuting this application in light of applicant's '613 registration?  In reviewing the facts of this case, it is also hard to ignore the clear inequality in resources between the Trademark Examining Attorney and applicant in this case, and it is epitomized by the work product of Dr.

Shteir.[10] As the Trademark Examining Attorney who prosecuted the DURANGO case [*In re Loew's Theatres, Inc.,* 769 F.2d 764, 226 USPQ 865 (Fed. Cir. 1985)] and clearly benefited from the Court's understanding of what can reasonably be expected of the United States Patent and Trademark Office (*Id.* at 868), I am not unsympathetic to the challenges placed upon the Trademark Examining Attorney in a case such as this one.[11] The burden was enhanced by the fact that Chippendales USA, Inc. now contends that this trade dress functioned as a service mark upon its introduction in 1979. While applicant has been pursuing this particular registration for almost a decade now, still it delayed for decades seeking this federal registration. Trademark Examining Attorneys laboring under demanding production requirements cannot afford to be time travelers, and few have advanced degrees in dramaturgy and theatre arts.

---

[10] Dr. Rachel Shteir, Doctor of Fine Arts, and Director of the Dramaturgy/Criticism Program at the Theatre School at DePaul University.

[11] If there is a distinction with *Loew's Theatres* (other than an access to information today that was unimaginable in 1982), it is that there applicant claimed that the Office should conduct a marketing survey in order to support a *prima facie* case. Here, even if one assumes that the Trademark Examining Attorney has made a *prima facie* case, applicant has responded with the impressive work product of Dr. Shteir – a level of effort not contemplated by the applicant in *Loews Theatres*.

29

Nonetheless, despite the Office's decided disadvantages, and the seemingly inconsequential nature of our determination upon applicant's assets or brand identity,[12] based upon this entire record, I find that the "Cuffs & Collar Mark" would appear to be an original creation and an immediately recognizable symbol belonging to applicant alone, and hence, inherently distinctive.

### *The expert*

While the majority minimizes the value of Dr. Shteir's work product in reaching its conclusions, I find that Dr. Shteir is an expert in the role and function of costumes/uniforms in striptease in the U.S., and credit her testimony as to the reactions of audience members to particular outfits worn by performers. Yes, her lengthy declaration of October 19, 2006, having sixty-six numbered paragraphs, is suffused with Twentieth-Century history, gender politics and cultural theories. But let us remember, she was not presented as a trademark law expert.

I accept Dr. Shteir's conclusion that the expectations of the members of the all-female audience to whom the show

---

[12]    Query, in which federal Circuit Court of Appeals will federal judges admit to finding a registration on the Principal Register without benefit of Section 2(f) to be stronger than the same one marked with § 2(f)?

was originally presented are critical to our decision
herein.  Dr. Shteir poses the question as follows:

> Would a woman attending her first Chippendales
> performance in the late 1970's have understood
> from that show alone that the "Cuffs and collar"
> were a designation of Chippendales or would she
> have seen it as just some generic dress for male
> strippers?

To put this in context, applicant reminds us that the
feminist movement and sexual revolution were in full swing
in 1979.  Male exotic dancing[13] in U.S. theatres packed with
women was quite new.  On the first of their "women's nights
out," these women would have perceived applicant's "out-of-
place" skeleton of a tuxedo as a new category that did not
fit neatly into their existing schema.  Accordingly, they
would be forced to create a new one.

Dr. Shteir points out that upon its first use by
applicant in 1979, the cuffs and collar design likely
symbolized promiscuous, liberated, sexual woman drawn to
class, prestige and wealth:

> Chippendales has taken two everyday articles that
> virtually always appear connected to a garment
> and, by featuring them alone, has given them new
> meaning.  The separation of a cuffs and collar

---

[13]     The majority is correct in noting that the recitation of
services in the application uses the term "exotic dancing for
women," and hence does not limit the services to those performed
by male dancers (*See* footnote 3).  Nonetheless, based on this
large record, the dissenting judge will assume without further
proof that substantially all Chippendales dancers have a Y
chromosome.

31

> from a shirt invokes the image of a tuxedo but
> now the space where the shirt used to be has new
> meaning:  sexuality, fantasy, and fulfillment.
> One reason that the connection between the Cuffs
> and Collar trade dress and Chippendales is so
> strong is that it is more than merely acquired
> recognition but is instead reflective of the many
> ways that the symbol perfectly matches the brand.

Dr. Shteir's declaration, ¶64.

Applicant explains that this "skeleton of a tuxedo,"

allowed audience members

> … to simultaneously hearken back to the fantasy
> of the wealthy man combined with the fantasy of
> the man whose true wealth is his ability to
> please.  This, too, is consistent with the iconic
> role that the Chippendales dancer plays over the
> course of the evening.  He is larger than life
> and can represent whatever each individual in the
> audience desires him to represent.

> How anyone could call a symbol laden with such
> rich emotional imagery merely a refinement of an
> existing ornamentation for a particular class of
> services is difficult to fathom.  Rarely has any
> symbol so perfectly captured the very essence of
> a brand.  And when a symbol captures so much so
> quickly, it is not functioning as mere
> ornamentation but as a designation of source.

Applicant's appeal brief at 17.

Based on all of this history, applicant argues that

"the very concept of formal attire for exotic dancing was

so unexpected and revolutionary that the Cuffs and Collars

were the cornerstone of the company's promotion and a key

to its success …"

### *The Law*

I concur with the majority that our primary reviewing Court has provided us with adequate direction on deciding issues of the registrability of trade dress. On the other hand, should the trademark bar need a new test for determining inherent distinctiveness for uniforms, that would be the correct forum in which applicant might propose its new, specialized test.

Professor McCarthy has observed that "[i]n reality, all three [*Seabrook Foods]* questions[14] are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicia of origin -- a trademark." J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition,* Section 8.02 [4] (3d ed. 1993). "Thus the focus of the inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product [services] from those of competing manufacturers [service providers]; if so, it is inherently distinctive. *Tone*

---

[14] Given the manner in which the product packaging in *Seabrook* differs from the involved design, the fourth *Seabrook* factor is not relevant to this case or similar trade dress questions that frequently arise in contexts where there are no literal elements present.

*Brothers Inc. v. Sysco Corp.,* 28 F.3d 1192, 31 USPQ2d 1321, 1331 (Fed. Cir. 1994), citing *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 582-84, 27 USPQ2d 1189, 1192-93 (2d Cir. 1993).

### *My Analysis*

In order to streamline my opinion, I will presume familiarity with the record, and merely highlight in a bulleted format those areas where I find myself in disagreement with the position of the Trademark Examining Attorney and/or salient points made by the majority:

- Applicant's expert in dramaturgy and theatre arts, Dr. Rachel Shteir, who has conducted extensive research on the history of striptease in the United States, declared that she is unaware of any prior uses by male strippers of cuffs and a collar separated from a shirt or other garment. Despite a plethora of evidence from the Internet, including detailed reviews of stripping during the era of burlesque shows (an area where Dr. Shteir's expertise is probably unequaled), the Trademark Examining Attorney has not pointed to this form of trade *dress* – where a performer having a skeletal tuxedo is both *dressed up* and *undressed* – for adult entertainment services.

- As to whether this was a common form of trade dress in the field of exotic dancing in 1979, the Trademark Examining Attorney has produced no evidence that something like the cuffs and collar

34

design separated from a shirt, blouse or other garment, existed in the field, prior to such use by the Chippendales dancers, whether used by male or female adult entertainers.

- The Trademark Examining Attorney made no reference to the "Sexy Bunny Costume" located by the majority. Frankly, it is difficult to conclude anything substantive from this largely indecipherable image. The possibility that applicant "borrowed" the cuffs and collar design from the Playboy bunny was raised *sua sponte* by this Board, not the Trademark Examining Attorney. The passing suggestion of one writer (also a nugget buried in a very large record and never highlighted by applicant or the Trademark Examining Attorney) that "the bunny suit … *inspired*" the Chippendales cuffs and collar design seems a fairly slender reed on which to hang, as does the majority, a conclusion that in 1979, the cuffs and collar trade dress was neither unique nor unusual in the field of exotic dancing for women. Furthermore, the declaration of Dr. Shteir sets out in detail the significant differences between applicant's entertainment services and whatever may have transpired at a Playboy Club.

- The Trademark Examining Attorney points out that exotic dancers often start such a show wearing some kind of "multi-layered" outfits – a stripper doctor with a stethoscope, construction worker with a utility belt, etc. Applicant clarifies that strippers may well begin their routine with some kind of fantasy outfit, often sporting non-trademark symbols for the easily-recognizable occupations of real life

35

characters in the story.  I agree with applicant that these occupational symbols contrast with the iconic choice of cuffs and collar expressly designed to be part and parcel of applicant's identity.  The mere fact that the cuffs and collar, like the utility belt, remain on the performer after the shirt is discarded, does not compel a finding that applicant's cuffs and collar design is pedestrian in the field of male exotic dancing.  To the contrary, accessories like a utility belt, G-string or ten-gallon hat might well serve a useful purpose for male exotic dancers (who we are told are seldom totally nude when dancing on stage) not served so easily by the cuffs and collar.

• As does the majority, I appreciate that there is sexual provocation involved in strippers' ever-more-minimal attire exposing ever-more of the performer's body.  However, like applicant, I question the relevance of the Trademark Examining Attorney's evidence of female strippers (well before the late-1970's) performing striptease acts with accessories such as pasties, tassels, boas, evening gowns or chorus pants.

• The Trademark Examining Attorney states that "all the examining attorney needs to show is that performers whether male or female, did dress in some type of stylized, if not formal attire," presumably at the time the exotic dancer first takes the stage.

I find this argument much too simplistic to satisfy the first prong of the *Seabrook Foods* ("common basic shape or design") test.

As discussed by the majority, certainly non-traditional marks, including distinctive costume

36

designs, can serve the dual purpose of identifying source and serving as an integral and necessary component of the services with which they are used. Arguably combinations of color, design, and ornamentation of clothing, including the cuffs and collar worn by Chippendales dancers, are analogous to the garb of iconic characters, such as the blue tights and red cape of Superman, that taken together represents the power to leap tall buildings in a single bound. *Cf*. *In re DC Comics, Inc.,* 689 F.2d 1042, 215 USPQ 394 (CCPA 1982).

• In their quest for similar "provocative costumes," the majority cites to several male-stripper costumes currently available on the Internet. I would argue that Halloween costumes for personal use do not support the position of the Trademark Examining Attorney. In fact, one of the more careless of these vendors of male-stripper costumes actually mentions the allure of the Chippendales dancer.[15] While possibly intended for

---

[15] http://www.halloweenmart.com ("Male stripper costumes are also a blast to put together, but the best look is usually modeled after the traditional Chippendale (sic) boys. Our stripper set is just what all you boys need – it comes with a black bow-tied collar and traditional cuffs. Throw on a pair of shorts or pants, and voila, your costume is complete.")

- use at masquerade balls, Halloween parties or with amateur theater, these sites are clearly not a source of uniforms for professional exotic male dancers. [16]

- In the context of "mere refinement of an existing form of trade dress," the Trademark Examining Attorney analogizes the facts herein to those in a Board case on trade dress packaging for Christmas merchandise.[17] The majority analogizes to the facts of *In re Hudson News Co.*, 39 USPQ2d 1915 (TTAB 1996). I find neither of these cases truly analogous to the facts of this case. The Board in *Hudson News* found the "cool bluish, clean and salubrious … shopping environment" to be "quite pedestrian," and not striking or unusual. *Id.* at 1923. The Court of Appeals for the Federal Circuit issued a *per curium* decision immediately. 114 F.3d at 1207.

- The applicant in *Hudson News* gave neither evidence nor reasons why prospective customers would find its trade dress "striking." 39 USPQ2d at 1924. By contrast, the record herein is replete with unsolicited conclusions – contained in articles

---

[16] http://www.costumecraze.com/BTRAD41.html and http://www.thinktanktoys.com/Adult-Male-Stripper-Kit-(BTRAD41).html and http://www.costumzee.com/tag/male+stripper/

[17] " … [T]he evidence shows that it is not uncommon for Christmas merchandise to be packaged in a manner which *resembles wrapped Christmas presents*. Thus, applicant's designs, which consist of stars and the colors red, green and gold indeed resemble wrapped Christmas presents, are a *mere refinement of a form of ornamentation for Christmas merchandise*."
*In re J. Kinderman & Sons Inc.,* 46 USPQ2d 1255 (TTAB 1998); Trademark Examining Attorney's brief at 13.

38

written in the earliest days of the Chippendales dancers by journalists without any expertise in intellectual property law – that the cuffs and collar serve as applicant's "trademark."  This usage is corroborated by declarations from non-attorneys stating, for example, that the Cuffs & Collar Mark are " … highly recognizable symbols of the Chippendales brand."[18]

- As to the Supreme Court's position in *Wal-Mart* that in certain circumstances, consumers "almost automatically" recognize a certain symbol as an indication of source, I find that principle is entirely consistent with applicant's position on the facts herein, while serving as an indictment of the mundane trade dress in *J. Kinderman* and *Hudson News*.

- The women of 1979, seeing (and touching) this skeleton of a tuxedo would be confronted at close range with a somewhat different and therefore memorable "schema" (Dr. Shteir's word).  Under such circumstances, I find it convincing that this symbology could well "immediately … signal a brand or a product 'source.'"  *Qualitex Co. v. Jacobson Products Co*., 514 U.S. 159, 115 S.Ct 1300, 34 USPQ2d 1161, 1162 (1995).

- Also, from the very first visit to a Chippendales dancers performance, the members of the female audience will notice the same "out-of-place" cuffs and collar on waiters, reprinted as images in the program, emblazoned in other indicia around the performance

---

[18]    Paragraph 4 of the second Denberg Dec. attached to Response to January 29, 2006 Office Action.

venue, and used online.[19]  *Contra Hudson News*, 39 USPQ2d at 1924.

- The alleged similarities of applicant's cuffs and collar design to the full, formal dress of wait staff generally does not strengthen the Trademark Examining Attorney's case.  The first time a group of women heads out for an evening of exotic male dancing and notices that their waiters are wearing cuffs and collar but no shirt, they would hardly mistake this "dress" for that of the waiter or maître d' at their usual dining venues.

- The issue before us is inherent distinctiveness, and it is clear that very early on, with applicant's sudden commercial success, those trying to compete in the field of male exotic dancing for women began

---

[19]  " … [I]n reviewing  the history of Chippendales I remembered that the Cuffs and Collar trade dress was not limited to the dancers themselves but also to the waiters serving the female patrons dinner before the show began…" Dr. Shteir's declaration, ¶45.

Also see "Chippendales:  The Story So Far," by Nicky Pope (1996) at 12 (describing a typical evening at Chippendales in the *pre-1983 time frame* (*emphasis* supplied), noting that the evening began with "male maitre d's and waiters all dressed in tight black trousers with chests bare … but they still wore collars and cuffs and bow ties.").

"The Chippendales, 'Kings of the G-Strings,' made their first appearance at a Los Angeles nightclub in 1978: handsome young men served drinks to women customers in the collars and cuffs which were to become their trademark …" "Shiny Chests and Heaving G-Strings:  A Night Out with the Chippendales," p. 70.

http://www.chippendales.com/

copying this distinctive imagery.[20]  Applicant suggests
that this history supports the conclusion that its
combination is "unmistakable," "clearly perceived,"
"highly unusual," or "extraordinary," and it is so
distinct that applicant has found ways easily to
promote this "highly unusual" feature.  *Id.*

- In weighing all the evidence in this record,
especially Dr. Shteir's declaration, I find that the
Office has not met its burden of showing that the
"Cuffs & Collar Mark" is a mere refinement of an
existing form of ornamentation.  Certainly the fact
that other exotic male dancers may begin a dance for
women with costumes where identifiable vestiges of an
occupation remain after the striptease simply has no
relevance to the place applicant's "Cuffs & Collar Mark"
deserves within the field of exotic dancing for women.

Accordingly, I would reverse the Office's refusal to
register this trade dress design.

---

[20]    Declaration of John Rivera, ¶¶ 4 – 8, October 24, 2001;
declaration of Kevin Cornell, ¶¶ 4 – 10, October 24, 2001;
declaration of Gary Goldman, ¶¶ 5 – 12, October 25, 2001;
Declaration of Kevin Denberg, ¶¶ 4 – 10, October 26, 2001;
declaration of Joseph Caulley, ¶¶ 5 – 8, August 2002; declaration
of Tony Johnson, ¶¶ 3 – 8, August 2002; Declaration of Kevin
Denberg, ¶¶ 2 – 7, August 20, 2002.